# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Susan B.B., | Case No. 17-cv-5039 (ECW) |
| Plaintiff, | |
| v. | **ORDER** |
| Nancy A. Berryhill, Acting Commissioner of Social Security, | |
| Defendant. | |

This matter is before the Court on Plaintiff Susan B.B.'s ("Plaintiff") Motion for Summary Judgment (Dkt. No. 17) ("Motion") and Defendant Acting Commissioner of Social Security Nancy A. Berryhill's ("Defendant") Cross Motion for Summary Judgment (Dkt. No. 21) ("Cross Motion"). Plaintiff filed this case seeking judicial review of a final decision by Defendant denying her application for disability insurance benefits. She specifically challenges the Administrative Law Judge's ("ALJ") evaluation of Plaintiff's treating physician's opinion and the ALJ's evaluation of Plaintiff's work history in the ALJ's credibility assessment. For the reasons stated below, Plaintiff's Motion is denied, and Defendant's Cross Motion is granted.

# I.     BACKGROUND

Plaintiff filed an application for disability insurance benefits on August 20, 2014, alleging disability beginning on September 1, 2013.  (R. 15.)[1]  Her application was denied initially and on reconsideration.  (*Id.*)  Plaintiff requested a hearing before an ALJ, which was held by video on September 6, 2016 before ALJ Lyle Olson.  (R. 15-26.)  The ALJ issued an unfavorable decision on October 13, 2016.  (R. 12.)  Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a), the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since September 1, 2013.  (R. 16-17.)

At step two, the ALJ determined that Plaintiff had the following severe impairments: obesity, status post bilateral total knee arthropathies, lumbar degenerative disc disease ("DDD") with hypertrophic facet arthropathy, compression fractures at L1 and from L3 to L5, grade 1 anterolisthesis of L5 on S1 with chronic bilateral spondylosis at L5, cervical DDD with moderate central canal and bilateral neural foraminal stenosis at C5-6, and bilateral carpal tunnel syndrome (CTS) with noted right middle trigger finger.  (R. 17.)  The ALJ determined that Plaintiff's other physical impairments were not severe, including seizures, a left leg wound, and hearing issues.  (R. 18.)  The ALJ noted that Plaintiff's seizures are controlled with medication, her leg wound healed in less than 12 months after onset, and Plaintiff refused testing related to the alleged hearing issues.  (*Id.*)

---

[1]     The Social Security Administrative Record ("R.") is available at Dkt. No. 11.

At the third step, the ALJ determined that Plaintiff does not have an impairment that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1. (*Id.*) The ALJ concluded that Plaintiff's spinal impairments do not rise to the level of compromise of the nerve root or spinal cord required by Listing 1.04. (*Id.*) The ALJ also determined that Plaintiff's ailments did not meet the requirements of major dysfunction of a joint of Listing 1.02 because the evidence does not demonstrate that Plaintiff has the degree of difficulty required. (R. 18-19.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b), including the ability to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; frequently reach to shoulder level and all directions other than overhead, bilateral upper extremities; frequently handle, finger and feel, bilateral hands; occasionally engage in the operation of foot controls, bilateral lower extremities; occasionally climb stairs/ramps, balance, stoop, kneel, crouch and crawl. (R. 19.) The ALJ determined that Plaintiff should never reach overhead, bilateral upper extremities, and never climb ladders/scaffolds, or work at unprotected heights or work with dangerous moving mechanical parts. (R. 19.) With this RFC, the ALJ determined that Plaintiff is capable of performing past relevant work as a cosmetologist at a light exertion level, which Plaintiff had continued performing on a part-time basis at a medium exertion level

3

after the September 1, 2013 date on which she alleges her disability began.[2] (R. 24, 61.) Alternatively, the ALJ determined that Plaintiff is capable of performing other jobs that exist in significant numbers in the national economy, including sales attendant, survey worker, and mailroom clerk, which are classified as light exertion and unskilled in the Dictionary of Occupational Titles. (R. 25.) Accordingly, the ALJ deemed Plaintiff not disabled. (*Id.*)

Plaintiff requested review of the decision. (R. 1.) The Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner. (R. 1.) Plaintiff then commenced this action for judicial review. The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties. The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II. LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law. *Nash v. Comm'r, Soc. Sec. Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)). "Substantial evidence is less

---

[2] The Dictionary of Occupational Titles classifies cosmetology as light work. Dictionary of Occupational Titles § 332.271-010, Cosmetologist (G.P.O.), 1991 WL 672806.

than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions." *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)). The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.*

"A disability claimant has the burden to establish her RFC." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'" *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)).

An ALJ should consider several factors, in addition to the objective medical evidence, in assessing a claimant's subjective symptoms, including daily activities; work history; intensity, duration, and frequency of symptoms; any side effects and efficacy of medications; triggering and aggravating factors; and functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *5-7 (S.S.A. Mar. 16, 2016) (listing these factors as relevant in evaluating the intensity, persistence, and limiting effects of a person's symptoms). But the ALJ need not explicitly discuss each factor, *Goff v. Barnhart*, 421 F.3d 785, 791 (8th

Cir. 2005), and a court should defer to the ALJ's credibility findings when the ALJ provides good reasons for discrediting claimant's statements, *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990). The ALJ "is in a better position to gauge credibility and resolve conflicts in evidence." *Nash*, 907 F.3d at 1090 (quoting *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016)).

### III. DISCUSSION

#### A. The Weight Assigned to the Treating Physician's Opinion

Plaintiff contends that the ALJ failed to properly consider the opinion of Plaintiff's treating physician, Dr. Lembcke, and therefore formulated an RFC that failed to incorporate all of Plaintiff's limitations. (Dkt. No. 18 at 4.) Plaintiff argues this error was significant for two reasons. First, according to Plaintiff, Dr. Lembcke's opinion that she would be absent from work more than three times a month requires the conclusion that she is disabled within the meaning of the Act, since "the Agency defines the 'ability to work' as the ability to do so full-time, or on a 'regular and continuing basis' . . . 8 hours a day, for five days a week, or an equivalent work schedule. (*Id.* at 7 (quoting SSR 96-8p).) Second, Plaintiff argues that if her treating physician's opinion is given proper weight, she would at most be able to perform sedentary work, which, given her age and training, would require a finding that she is disabled under the listings in Appendix 2. (*Id.* at 8-9.)

"A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it. An ALJ may elect under certain circumstances not to give a treating physician's opinion controlling weight. For a treating physician's opinion to

6

have controlling weight, it must be supported by medically acceptable laboratory and diagnostic techniques and it must not be 'inconsistent with the other substantial evidence in [the] case record.'" *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (quoting 20 C.F.R. § 404.1527(d)(2)) (citing *Goff*, 421 F.3d at 790; *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005)). "A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions." *Id.* (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)).

On October 28, 2014, Dr. Lembcke filled out a Medical Source Statement ("MSS") in which he was asked to opine on Plaintiff's "ability to do work-related activities on a day-to-day basis in a regular work setting." (R. 327.) The lift, carry, stand, walk, and sit limitations identified by Dr. Lembcke were due to back pain, knee pain, and leg and foot pain. (R. 327.) He opined that Plaintiff could lift and carry no more than 10 pounds on an occasional or frequent basis "due to low back pain." (R. 327.) He opined that Plaintiff could stand and walk (with normal breaks) about 3 hours and sit about 2 hours (with normal breaks) during an 8-hour day. (*Id.*) His notes indicate that Plaintiff's stand and walk limitation is due to "knee pain/back pain" and the sitting limitation is due to "low back pain" and "leg + foot pain." (*Id.*) He also opined that Plaintiff could sit 90 minutes before changing position, stand 60 minutes before changing position, needed to walk around every 60 minutes, and must walk for about 30 minutes each time. (R. 328.) Dr. Lembcke also opined that Plaintiff needed the opportunity to shift at will from sitting or standing/walking. (*Id.*)

7

Dr. Lembcke further opined that Plaintiff "has much difficult[y] moving from sitting to standing and balanc[ing] when standing in abnormal due to knee and back pain" and that range of movement "of lumbar spine is limited due to pain." (R. 328.) Dr. Lembcke opined that Plaintiff could never crouch, climb ladders and stairs, and only occasionally twist or stoop or rotate her neck. (R. 328.) He opined that fine manipulation with fingering of her trigger finger would be affected and she has "[d]ifficulty manipulating small objects due [to] locking of finger." (R. 329.) He opined that she should avoid extreme cold exposure because it "increases pain in knees + hands, as does wet/humid conditions." (R. 330.) Finally, he noted that Plaintiff is "currently having difficulty working 4 hours 3 days per week due to pain" and her impairments would cause Plaintiff to miss more than three days of work a month. (*Id.*) As noted above, Plaintiff was working at a medium exertion level in her cosmetology job. (R. 24; R. 61.) On June 7, 2016, in a response to a request for comment on any changes in Plaintiff's condition since he filled out the October 28, 2014 MSS, Dr. Lembcke responded "[t]here was no substantive change in her condition," and that he last saw Plaintiff on April 8, 2016. (R. 359.)

Based on a careful review of the record, the Court concludes that the ALJ gave appropriate weight to the opinion of Plaintiff's treating physician Dr. Lembcke, and that the RFC formulated by the ALJ is supported by "some medical evidence." *See Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) ("Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace.").

Plaintiff contends that the ALJ "failed to acknowledge the Agency's clear preference for the opinions of treating sources" (Dkt. No. 18 at 10 (citing 20 C.F.R. §§ 404.1527(c)(2))), and that the reasons the ALJ gave for rejecting Dr. Lembcke's opinion were insufficient (*id.* at 11-12). The Court addresses both arguments below.

As to Plaintiff's contention that the ALJ failed to acknowledge the Agency's clear preference for treating physician's opinions, the ALJ noted that his RFC determination was based in part on his consideration of "opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p." (R. 19). In addition, the ALJ described Dr. Lembcke's MSS in detail in the decision. (R. 23.) Accordingly, the Court finds the ALJ acknowledged the Agency's guidelines regarding the weight given treating sources.[3]

The Court next addresses whether the reasons the ALJ gave for rejecting Dr. Lembcke's opinion were sufficient, i.e., whether the ALJ gave Dr. Lembcke's opinions appropriate weight. After describing Dr. Lembcke's opinion in detail, the ALJ explained that "[t]hese opinions are not given full weight because they are not consistent with examinations, including examinations performed by Dr. Lembcke as well as the

---

[3] Plaintiff suggests that the ALJ did not properly weigh Dr. Lembcke's opinions in view of the length of the treating relationship and Dr. Lembcke. (Dkt. No. 18 at 10.) Although the ALJ did not explicitly discuss the length of the treating relationship in his opinion, the hearing transcript reflects that the ALJ was made aware of the relationship. (R. 36 (describing Dr. Lembcke as "a treating physician [who] has been seeing [Plaintiff] for 30 years as a primary care doctor").) In any event, this factor is only one of several to be considered. *Leslie J. v. Berryhill*, 17-CV-1319 (TNL), 2018 WL 4603278, at *23 (D. Minn. Sept. 25, 2018).

9

claimant's ongoing ability to work part-time in a light job."[4] (R. 23.) The ALJ also relied on Plaintiff's testimony at the September 6, 2016 hearing that her pain decreased when she took her medication and that she had no side effects from her medication when explaining why Dr. Lembcke's opinions were not given full weight. (R. 23, *see id.* 44-45 (Plaintiff's testimony regarding pain medication).)

1. **Dr. Lembcke's and other physicians' medical records**

The ALJ gave Dr. Lembcke's opinions appropriate weight because Dr. Lembcke's examination records, as well as other objective medical evidence, are inconsistent with Dr. Lembcke's opinion set forth in his October 28, 2014 MSS. For example, during an October 2013 examination by Dr. Mark Gundersen, Plaintiff "complained of neck pain; she had neck stiffness, tenderness, and shoulder pain," but on examination she "was in no acute distress and well appearing" and had "no muscle spasm, no crepitus, no impaired range of motion, no headache, no upper extremity paresthesias, [and] no upper extremity weakness." (R. 294.) She had normal gait and station. (R. 296.) She rated her neck pain as only 4 out of 10. (R. 294.) Imaging showed only moderate spondylosis at C5-6 and mild hypertrophic changes. (R. 21, 303.) Plaintiff fell at work on March 24, 2014 while sitting on a chair. (R. 280.) During a March 27, 2014 examination by Dr. John Torseth as a result of the fall, she was "alert, pleasant, and cooperative." (R. 280-281.) At a follow-up examination by Dr. Lembcke in April 2014, she was able to arise from a chair

---

[4] Plaintiff acknowledged that she was actually performing her part-time cosmetology work at a medium, not light, exertion level. (Dkt. No. 18 at 8 n.3.)

with minimal difficulty. (R. 293.) Dr. Lembcke noted during that examination that Plaintiff's gait and station, as well as her muscle strength/tone, were "Normal." (R. 293.) On August 28, 2014, during an examination by Dr. Julianne Gutzmer (who was treating Plaintiff for her leg wound), Plaintiff had "No particular complaints," was "anxious to return to work," and "probably OK if she's not standing for long periods." (R. 285-86.)

This medical evidence regarding Plaintiff's normal gait and station, ability to rise from a chair, normal muscle strength/tone, and eagerness to return to work is inconsistent with the limitations identified by Dr. Lembcke in the October 28, 2014 MSS. The inconsistencies between Dr. Lembcke's examination notes, as well as those of other physicians who examined Plaintiff, is sufficient reason for the ALJ to discount Dr. Lembcke's opinion. *See Adkins v. Comm'r, Social Security Administration*, No. 18-1323, -- F.3d --, 2018 WL 6625772, at *3 (8th Cir. Dec. 19, 2018) ("The ALJ noted significant inconsistencies between Dr. Hatfield's opinions as recorded on the MSS and the earlier medical evidence in the record. We have often noted that the MSS form 'consists of a series of check marks assessing residual functional capacity, a determination the ALJ must make, which are conclusory opinions that may be discounted if contradicted by other objective medical evidence in the record.'") (citing *Johnson v. Astrue*, 628 F.3d 991, 994 (8th Cir. 2011); *Thomas v. Berryill*, 881 F.3d 672, 675 (8th Cir. 2018); *Toland v. Colvin*, 761 F.3d 931, 937 (8th Cir. 2014); *Teague v. Astrue*, 638 F.3d 611, 615-16 (8th Cir. 2011)).

Further, on November 6, 2014, during a follow-up examination for her leg wound by Dr. Gutzmer, Plaintiff was recorded as having "No particular complaints" and a 4 on

11

the Pain Scale. Two weeks later, Dr. Gutzmer recorded Plaintiff as having a 0 on the Pain Scale. (R. 384.) On February 12, 2015, when examined by Dr. Lembcke, Plaintiff reported that she experienced right-side numbness and weakness when lying in bed, but said both resolved within 15 minutes of waking. (R. 386.) At that exam, Plaintiff had a wide based and ataxic gait, but her joints, bones, and muscles were normal, and she had 3/5 strength in her right arm and leg. (R. 388.) She also reported the onset of left leg pain as of January 1, 2015 that resolved when in bed and increased if sitting in a chair. (R. 386.) Magnetic resonance imaging (MRI) conducted on February 17, 2015 of her cervical spine showed moderate spondylosis with degenerative joint disease with only moderate central canal and neural foraminal stenosis with other areas of milder spinal stenosis. (R. 382-83.) In March 2015, Plaintiff's gait was still abnormal with antalgia and limping on the right and left, but no longer ataxic. (R. 391.) The ALJ considered Plaintiff's complaint of numbness in her right hand in April 2015, but as the ALJ noted, an electromyogram (EMG) and nerve conduction study showed "very mild median nerve entrapment at the wrist on the right" with "no evidence of radiculopathy or myelopathy with the right upper extremity." (R. 22, R. 402.) In March 2016, during a neurology consult by Dr. Eugeniu Muntean, Plaintiff appeared to be "in no acute distress" and was able to toe walk (but not heel or tandem walk) and had normal Romberg. (R. 407-08.)

On June 6, 2015, Plaintiff presented for examination by Dr. Lembcke due to "more pain and swelling in both hands but left worse than right" and "more knee and back pain with the current weather and activities." (R. 415.) Dr. Lembcke changed Plaintiff's prescription from one tablet of Oxycodone-Aceteminophen at night to two

12

tablets. (R. 415.) At that time, Plaintiff was taking Oxycodone only "at night to sleep." (R. 415.) In January 2016, Dr. Lembcke examined Plaintiff for left leg and foot pain. (R. 418.) He noted that her foot pain began "over a year" ago and was "[m]uch worse if on feet all day," renewed her Oxycodone bedtime prescription, and recommended "Tylenol for pain" and "OTC arthritis meds." (R. 418.) Dr. Lembke's musculoskeletal examination noted no issues with Plaintiff's gait or station, although her feet were painful, as was her left hip when rotated. (R. 419.) On April 8, 2016, Plaintiff presented requesting "chronic narcotic therapy for both knees" and because "[o]n work days 3 days per week she is in great pain when she arrives home." (R. 420.) She signed a narcotics contract, and Dr. Lembke prescribed one Oxycodone-Acetaminophen tablet as needed daily for "breakthru pain" in addition to the two bedtime tablets.[5] (R. 420.) Two months later, on June 7, 2016, Dr. Lembcke offered his opinion that "[t]here was no substantive change in [Plaintiff's] condition" since he completed the October 28, 2014 MSS. (R. 359.)

In sum, the Court finds that ALJ gave appropriate weight to Dr. Lembcke's opinions in view of Dr. Lembcke's examination notes and those of other physicians who treated or examined Plaintiff indicating that Plaintiff's functional limitations were not as severe as those identified in Dr. Lembcke's MSS. The Court also concludes that substantial evidence supports the ALJ's RFC finding. The Court acknowledges the

---

[5]   The April 6, 2016 record does not contain the results of any musculoskeletal examination. (R. 420.)

13

evidence that Plaintiff suffered from back and knee pain, but the Court may not reverse the ALJ's decision "merely because substantial evidence also supports the contrary outcome." *Nash*, 907 F.3d at 1089.

### 2. Plaintiff's testimony that medication significantly reduced her pain

The ALJ also properly relied on Plaintiff's testimony that medication significantly reduced her pain with no side effects as inconsistent with Dr. Lembcke's medical assessment. (*See* R. 21, 44-45.) Dr. Lembcke prescribed the medication to Plaintiff in March 2015 (R. 352-53), after he completed the October 28, 2014 MSS that Plaintiff relies on (R. 331). Dr. Lembcke's June 7, 2016 update did not address the effect of Plaintiff's medication on her condition. (R. 359.) "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Hensley v. Colvin*, 829 F.3d 926, 933-34 (8th Cir. 2016) (quoting *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009)). At the hearing on September 6, 2016, the ALJ asked Plaintiff if her pain medications help with her pain, to which she responded: "Oh yeah." (R. 44-45.) She stated that when she takes her pain medications, if she was initially at a "level eight throbbing pain" and then takes her medications, it brings the pain to: "Probably about a three. The pain is still there, but it's not pain." (R. 45.) She further stated that she has no side effects from the pain medication. (*Id.*) Plaintiff's testimony regarding her pain medication and its ability to control her pain is evidence supporting the ALJ's decision not to give Dr. Lembcke's opinion full weight. *See Brace v. Astrue*, 578 F.3d 882, 886 (8th Cir. 2009) ("We conclude that the ALJ reasonably disregarded [the treating physician's] opinion because it was inconsistent with substantial evidence that [plaintiff's] mental impairment was not

14

disabling, so long as he took his prescribed medication."). Moreover, the fact that Plaintiff had not begun taking her pain medication at the time of Dr. Lembcke's October 14, 2014 MSS and the fact that Dr. Lembcke did not address the effect of Plaintiff's pain medication further supports the ALJ's decision not to give Dr. Lembcke's opinion full weight. *See id.* ("The record does not establish that [plaintiff] was taking his medication during the period when [the treating physician] concluded that his mental condition was disabling.").

### 3. Plaintiff's ongoing ability to work at her cosmetology job and other daily activities

The Court also finds ALJ properly acknowledged Plaintiff's "ongoing ability to work part-time in a light job" as part of the reason for discounting Dr. Lembcke's opinion. (R. 23.) Plaintiff contends that the ALJ erred by relying on her part-time work because Dr. Lembcke stated in the October 2014 MSS that Plaintiff is "currently having difficulty working 4 hours 3 days per week due to pain." (Dkt. No. 18 at 11; R. 330.) Although Dr. Lembcke acknowledged that her work was part time, the ability to work part time and her daily activities are relevant to the RFC assessment and in assessing whether Dr. Lembcke's opinion is consistent with the evidence. *See Medhaug v. Astrue*, 578 F.3d 805, 815 (8th Cir. 2009) (noting that a treating physician's opinion can also be "contradicted by [] testimony at the administrative hearing that [Plaintiff] was currently employed" in a less than full-time job); *Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004) ("It was also not unreasonable for the ALJ to note that [plaintiff's] daily activities, including part-time work, . . ., were inconsistent with her claim of disabling pain."). It is

also important to note that Plaintiff was performing her part-time job at a medium exertion level at that time (although it is classified as light exertion level employment). (Dkt. No. 22 at 10; R. 273.) Thus, while Plaintiff argues that her treating physician's opinion that she would be absent from work more than three days a month is sufficient to meet her burden that she was "disabled" under the Act (Dkt. No. 18 at 7), when Dr. Lembcke offered that opinion, Plaintiff was performing her job at a medium exertion level. (*See* R. 24.) Because the job of cosmetologist is classified as a "light exertion" in the Dictionary of Occupational Titles, it was appropriate for the ALJ to discredit Dr. Lembke's opinion as to the number of days a month Plaintiff would miss work.

Plaintiff's additional daily activities also support the ALJ's RFC assessment. Plaintiff reported that she is able to do personal care chores, can walk down to the basement to do laundry, vacuums, and can do other chores (although she testified that it takes longer, and she needs to take breaks). (R. 20; R. 53-56.) Plaintiff reported that she is able to drive or ride in a car, shops once a week, and takes her dog outside on a daily basis. (R. 226.) This evidence of daily living activities "further confirms [Petitioner's] ability to work on a daily basis in the national economy." *Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000) (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000); *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996); *Walker v. Shalala*, 993 F.2d 630, 631-32 (8th Cir. 1993)).

### 4. The weight assigned the State Agency medical expert opinions

Plaintiff contends that the ALJ relied excessively on the State Agency's non-treating medical consultants, stating that "the ALJ assigned 'great weight' to the opinions

of the State Agency nonexamining consultants." (Dkt. No. 18 at 16 (citing R. 23-24).)
An ALJ may properly credit the opinion of a non-treating medical consultant over a treating physician's opinion when there are inconsistencies with the treating physician's opinion. *Wagner v. Astrue*, 499 F.3d 842, 849 (8th Cir. 2007) (citing *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003)). Here, the ALJ did not give the State Agency opinions "great" weight. (R. 24.) The ALJ merely stated that his decision is "supported" by the State Agency consultants' opinions and they "are consistent with the record and are given weight because the claimant has mostly conservative treatment for her pain and her symptoms improve with medication." (R. 23-24.) The Court finds no error in the weight assigned by the ALJ to the State Agency consultants' opinions.[6]

**B.     The ALJ's assessment of Plaintiff's claimed symptoms**

Plaintiff also argues that the ALJ "erred by failing to consider Plaintiff's stellar work history in his credibility assessment." (Dkt. No. 18 at 17-20.) The ALJ did not make a finding of Plaintiff's credibility, in accordance with Social Security regulations which eliminated the term "credibility" from the policy, SSR 16-3p, 2016 WL 1119029 ("eliminating the use of the term 'credibility' from our sub-regulatory policy" and clarifying "that subjective symptom evaluation is not an examination of an individual's character"), but the ALJ did state that "claimant's statements concerting the intensity,

---

[6]     Plaintiff does not argue that, if the ALJ correctly determined her RFC, she should still be found to be disabled as not capable of performing past relevant work "as generally performed" or that she would be able to perform "many jobs that exist in the national economy," including sales attendant, survey worker, and mailroom clerk. (*See* R. 24.) Accordingly, the Court does not address these findings.

persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 19-20.) In her opening brief, Plaintiff states that she is using the word "credibility" to refer to the analysis in SSR 16-3p (Dkt. No. 18 at 17-18, n.4), but she fails to articulate why her work history is evidence of the intensity and persistence of her symptoms. Instead, Plaintiff contends that it is evidence of her "willingness to work." (*Id.* at 19.) The cases cited by Plaintiff specifically refer to work history in the context of credibility, which is no longer part of an ALJ's assessment. *See, e.g.*, *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983) ("A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability."). Even when an ALJ was required to make a credibility assessment, "work history [was] just one of many factors that the ALJ is instructed to consider in weighing the credibility of claimant testimony." *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998). But because of the change in regulations, rather than assess credibility, the ALJ was required to and did assess the medical evidence and other evidence in the record to evaluate the intensity and persistence of Plaintiff's symptoms. As previously discussed, the medical evidence in the record supports the ALJ's decision.

In any event, the ALJ noted Plaintiff's work history several times. For example, the ALJ stated: "The record reflects that the claimant worked as a cosmetologist for several years, from 1990 to present. The claimant's earnings records indicate that the claimant worked at or above substantial gainful activity during this time (*see* Exs. 10D; 3E; 15E)." (R. 24; *see also, e.g.*, R. 21 ("The claimant reported that she had the same job

18

for 24 years and went from 40 hours per week to 12 hours per week.").) "An ALJ need not explicitly discuss each relevant factor." *Adkins*, 2018 WL 6625772, at *3. It is clear from the ALJ's statements that the ALJ was well aware of Plaintiff's work history and properly considered it.

## IV. ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1. Plaintiff Susan B.B.'s Motion for Summary Judgment (Dkt. No. 17) is **DENIED**;

2. Defendant Acting Commissioner of Social Security Nancy A. Berryhill's Cross Motion for Summary Judgment (Dkt. No. 21) is **GRANTED**; and

3. This case is **DISMISSED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: December 28, 2018         *s/Elizabeth Cowan Wright*
                                 ELIZABETH COWAN WRIGHT
                                 United States Magistrate Judge